USA v. Zedner

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2007

(Argued: April 24, 2008          Decided: October 28, 2008)

Docket No. 07-0149

_____

UNITED STATES OF AMERICA,

Appellee,

- v. -

JACOB ZEDNER,

Defendant-Appellant.

_____

Before:  KEARSE and POOLER, Circuit Judges, and COTE, District Judge*.

Appeal from a judgment of the United States District Court for the Eastern District of New York convicting defendant of attempted bank fraud, see 18 U.S.C. § 1344; motion by the United States to dismiss the appeal on the ground that the defendant is a fugitive.

Motion granted; appeal dismissed with prejudice.

Judge Pooler dissents in a separate opinion.

CARRIE CAPWELL, Assistant United States Attorney, Brooklyn, New York (Roslynn R. Mauskopf, United States Attorney for the

_____

* Honorable Denise Cote, of the United States District Court for the Southern District of New York, sitting by designation.

Eastern District of New York, Emily Berger, Assistant United States Attorney, Brooklyn, New York, on the brief), for Appellee.

EDWARD S. ZAS, New York, New York (Federal Defenders of New York, Inc., Appeals Bureau, New York, New York, on the brief), for Defendant-Appellant.

KEARSE, Circuit Judge:

Defendant Jacob Zedner, an original indictment against whom was dismissed without prejudice on speedy trial grounds, has appealed from a judgment entered in the United States District Court for the Eastern District of New York following a December 2006 jury trial before Arthur D. Spatt, Judge, convicting him on three counts of a new indictment charging him with attempted bank fraud, in violation of 18 U.S.C. § 1344, and sentencing him principally to a "time served" term of imprisonment and a three-year term of supervised release. On appeal, Zedner contends principally (1) that in December 2006, jurisdiction of his case was in this Court rather than in the district court, and hence his 2006 conviction is a nullity; and (2) that if the district court had jurisdiction, it should have, pursuant to the Speedy Trial Act, 18 U.S.C. § 3161 et seq., dismissed the original indictment with prejudice, rather than without prejudice.

Having been sentenced to time served, Zedner was released from custody in December 2006 and commenced service of his supervised-release term. The government moves to dismiss his appeal on grounds that, following his release and during the pendency of this appeal, Zedner has become, and remains, a

- 2 -

fugitive. For the reasons that follow, we grant the motion and dismiss the appeal with prejudice.

## I. BACKGROUND

Zedner was first indicted in 1996 on several counts of, *inter alia*, attempting to defraud financial institutions by seeking substantial loans through the use of patently fraudulent "Treasury bonds" as security. The case was originally assigned to Thomas C. Platt, *Judge*. The course of the prosecution, prolonged by, *inter alia*, concerns for Zedner's competency, is chronicled in several opinions, familiarity with which is assumed. *See, e.g.*, *United States v. Zedner*, 193 F.3d 562 (2d Cir. 1999) ("*Zedner I*") (vacating a 1998 district court order that found Zedner incompetent to stand trial following a hearing at which he appeared *pro se*, and directing that the court appoint counsel to represent Zedner at a new hearing); *United States v. Zedner*, 29 Fed. App'x 711 (2d Cir. 2002) ("*Zedner II*") (affirming a 2001 order finding that Zedner was then incompetent to stand trial); *United States v. Zedner*, 401 F.3d 36 (2d Cir. 2005) ("*Zedner III*") (following a 2002 determination that Zedner was competent to stand trial and a 2003 trial, affirming his conviction; rejecting claims of error in, *inter alia*, the administration of the Speedy Trial Act, the admission of evidence, and the jury instructions; but remanding for resentencing), *rev'd*, *Zedner v. United States*, 547 U.S. 489, 509 (2006) ("*Zedner IV*")

- 3 -

(reversing, on speedy trial grounds, the affirmance of Zedner's conviction and "leav[ing] it to the District Court to determine in the first instance whether dismissal should be with or without prejudice").

A. The Proceedings After Zedner IV

Following the Supreme Court's Zedner IV decision reversing Zedner's 2003 conviction, Zedner moved in this Court to have his case remanded to a different district judge. In an order entered on September 19, 2006, we denied that motion and remanded the case to the district court for further proceedings in accordance with the Supreme Court's opinion in Zedner IV. See United States v. Zedner, No. 04-0821 (2d Cir. Sept. 19, 2006) ("Zedner V"). The mandate, however, which normally would have issued 21 days thereafter, see Fed. R. App. P. 41(b)-(c), 40(a)(1), did not issue until February 1, 2007.

In the meantime, following our order in Zedner V, proceedings were resumed in the district court. After expedited briefing by the parties as to whether the Speedy Trial Act dismissal should be with or without prejudice, Judge Platt entered an order on October 13, 2006, dismissing the 1996 indictment without prejudice. See United States v. Zedner, No. 96 Cr. 285 (E.D.N.Y. Oct. 13, 2006) ("Zedner VI"). On the same day, agents of the United States Secret Service rearrested Zedner for attempted bank fraud; a grand jury thereafter returned a new indictment against him, charging him with three counts of

- 4 -

attempting to defraud financial institutions, in violation of 18 U.S.C. § 1344. Judge Platt having recused himself from further proceedings involving Zedner upon deciding Zedner VI, the new case was assigned to Judge Spatt.

Zedner moved for reconsideration of Zedner VI, contending that the dismissal should have been with prejudice. Judge Spatt denied the motion, stating that Judge Platt had analyzed all of the pertinent statutory factors and had not overlooked any factual matters or controlling precedent. See United States v. Zedner, No. 06 Cr. 717 (E.D.N.Y. Nov. 17, 2006) ("Zedner VII").

Zedner was tried on the new indictment in December 2006 and was found guilty on all counts. He was sentenced principally to a "time served" prison term and a three-year term of supervised release, and was promptly released to commence serving his term of supervised release. The conditions of his supervised release included the standard requirement that Zedner not leave the judicial district without the permission of the court or his probation officer and the special condition that Zedner receive extensive mental health therapy, including in-patient treatment if necessary, at the discretion of the Probation Department.

B. The Present Appeal and the Government's Motion To Dismiss

On January 3, 2007, Zedner commenced the present appeal, challenging both the decision in Zedner VI, which declined to dismiss the original indictment with prejudice rather than without prejudice, and the 2006 judgment of conviction. With respect to

his conviction, Zedner's principal contention is that because the mandate of this Court with respect to our September 19, 2006 order in Zedner V did not issue until February 1, 2007, jurisdiction of his case remained in this Court until the latter date, making his December 2006 trial in the district court a nullity. Zedner also argues that there were two errors in the conduct of the trial.

The government defended the district court's Zedner VI decision to dismiss the 1996 indictment without prejudice on the ground that the court had considered all of the applicable factors, and the decision not to dismiss with prejudice was within the court's discretion. The government argued that the trial of Zedner prior to the issuance of the mandate on the Zedner V order did not require vacatur of his conviction because the mandate rule does not create inflexible jurisdictional boundaries and the nonissuance of the mandate (which had gone unnoticed by the parties and the district court) was a technical defect that did not amount to plain error.

The parties' briefing of the appeal was complete by early July 2007. In August 2007, Zedner informed the Probation Department that his brother had passed away in Israel. Zedner requested permission to go to Israel; on the recommendation of his probation officer, the district court gave Zedner permission to go to Israel for two weeks. Zedner left the United States for that two-week trip in September 2007; he has never returned.

In March 2008, the government, invoking the fugitive disentitlement doctrine, which recognizes our discretion to

dismiss the appeal of a party who has become a fugitive during the pendency of his appeal, see Part II below, moved to dismiss Zedner's appeal with prejudice on the ground that he had become, and remains, a fugitive. In support of its motion, the government submitted a "Violation of Supervised Release" report by the Probation Department dated February 13, 2008 (or "Violation Report" or "Report"), addressed to the district court, charging that Zedner had violated the terms of his supervised release by failing to report to his probation officer as instructed and, without timely notice, changing his residence. The Report stated, inter alia, that Zedner "traveled to Israel on September 9, 2007, thereby requiring him to return on or before September 23, 2007. To date, he has failed to return." (Violation of Supervised Release report dated February 13, 2008, at 7.)

To the extent pertinent here, the Report detailed the permission that Zedner had been given for a two-week trip to Israel, and Zedner's failure to return to the United States, as follows:

> On August 20,[ ]2007, the defendant contacted the probation officer to advise that his brother had passed away in Israel and as such, he was seeking permission to travel there. The following day, upon a recommendation from the probation officer, the Court authorized permission for Pretrial Services to return the defendant's passport to him temporarily and also granted the defendant permission to travel internationally for a two week trip to Israel. On August 27, 2007, the defendant picked up his expired Israeli passport and a copy of the Court's order permitting him to travel to Israel. At that time, he acknowledged understanding that he was taking a risk in leaving the U.S. without a current passport. He insisted that he would be able to have a new one issued to him at the U.S. Embassy in Israel. On that

- 7 -

date, the defendant was specifically warned that if he did not return within two weeks of leaving the United States, he would be considered in violation and believed to have absconded from supervision.

On September 9, 2007, the defendant left a voice mail message advising the probation officer that he was leaving for Israel that date and stated that "God willing, I will be back in two weeks." Later that month, the defendant's criminal attorney, Tracey Gaffey, Esq. advised the probation officer that the defendant was reportedly "stuck" in Israel as he was having difficulty obtaining a U.S. Passport. On October 2, 2007, the Probation Department responded to a request from the U.S. Consulate in Israel. They were seeking a photograph of the defendant as well as confirmation that our office did not object to the defendant's requests for a U.S. Passport. The photograph was provided and the Probation Department solicited the Consulate's assistance in helping the defendant obtained [sic] the documents needed to return to the U.S.

Subsequently, on October 16, 2007, a message was left on the defendant's home answering machine inquiring as to the defendant's whereabouts but the probation officer received no response from the defendant or his family. Subsequently, a written notice was sent to the defendant's home instructing him to report to the Probation Department on November 13, 2007. He failed to report as directed. The probation officer contacted Ms. Gaffey on that date and she advised that it was her understanding the defendant remained in Israel and that the U.S. Embassy there had refused to issue him any travel documents. She instructed the probation officer to contact the defendant's appeals attorney, Edward Zass [sic], Esq. Mr. Zass [sic] was contacted and he informed that he had been in contact with the defendant via e-mail. He provided the defendant's e-mail address to the probation officer.

On November 19, 2007, the probation officer e-mailed the defendant with instructions for him to contact the probation officer in regards to his situation with the U.S. Embassy as he was considered to be in violation of his supervised release term for failing to return from his trip as directed. That date, he responded via e-mail and informed that his passport had not been renewed and as such, he had no authorization to leave Israel. The defendant promised to provide documentation from the U.S.

- 8 -

Embassy regarding their refusal to renew his passport. No such documentation was provided. In an e-mail sent to the defendant on November 30, 2007, the probation officer requested for [sic] more information regarding the defendant's contact at the U.S. Embassy or the Israeli Consulate. The defendant did not respond to this request.

On December 5, 2007, the probation officer contacted Ms. Regina Ballard of the U.S. Department of State regarding Zedner's claims that he was being denied a passport. Ms. Ballard advised that the defendant's statements regarding the renewal of his passport were false. In fact, Ballard informed that in October 2007, the U.S. Embassy in Israel had offered the defendant a limited passport which would have allowed him to return to the U.S. but he refused it, as he wanted a full validity passport. He was reportedly told that this request could be considered once he returned to the U.S. with the limited validity passport.

In early January 2008, the probation officer was put in contact with Elisa Green of the U.S. Department of State. She confirmed that the U.S. Embassy's offer to issue a limited passport to the defendant was still valid. As such, on January 11, 2008, the probation officer sent an e-mail to the defendant advising him on how to obtain a limited passport. The e-mail also directed him to return to the U.S. and to report to the probation officer on February 12, 2008. He was warned that failure to comply would result in the filing of violation charges. On January 14, 2008, the defendant replied with an e-mail stating that he did not have the financial means to return to the U.S. The defendant has not contacted the probation officer since that time and failed to report as directed on February 12, 2008.

(Violation of Supervised Release report dated February 13, 2008, at 4-6 (emphases added); see also id. at 9 ("[I]n his January 2008 e-mails, the defendant reported that his lack of financial resources kept him from returning to the U.S.").) The Report added that Zedner, in his e-mails,

also stated that he had been arrested for assault in

- 9 -

Israel on January 12, 2008 and that as the case was still open, he was not permitted to leave Israel.

(Id. at 9-10.)

Zedner, in a declaration submitted by his appellate counsel (see Declaration of Edward S. Zas dated April 4, 2008 ("Zas Declaration" or "Zas Decl.")), opposes the government's motion to dismiss his appeal. Zedner contends principally that the government has not proven that he is a fugitive and thus that the principles underlying the fugitive disentitlement doctrine militate against application of that doctrine to him.

As to the Violation Report as the government's basis for asserting that Zedner is a fugitive, the Zas Declaration states that "Mr. Zedner's counsel first received the Report on or about March 24, 2008, when it was served along with the Government's motion to dismiss the appeal"; it argues that "[t]he Report was never filed with the clerk of the district court and was never served on defense counsel; thus, it was never subject to adversarial testing." (Zas Decl. ¶ 7.) The Zas Declaration does not challenge the Report's assertions as to the events, e.g., that Zedner was given permission to leave the United States for only two weeks and was warned that if he failed to return within two weeks after his departure he would be considered to have absconded; that Zedner claimed to have difficulty in obtaining a passport from the United States Embassy in Israel; that Zedner was told by the United States Embassy that he would be granted a limited passport if he first presented a valid airline ticket for the United States; that Zedner promised to provide his probation

- 10 -

officer with documentation as to his difficulty in obtaining a passport but provided no such documentation; that Zedner did not respond to his probation officer's request for more information; and that Zedner has not returned to the United States. The Zas Declaration adds information that counsel received directly from Zedner:

> Mr. Zedner advised the undersigned in October 2007 . . . that he was told that he would only be granted a limited passport if he first presented a valid airline ticket for the United States and that he did not have any money to purchase such a ticket.
>
> 11. In November 2007, Mr. Zedner contacted me again and advised that he still could not obtain a passport to return to the United States. He told me that he wanted to come back to this country, but had no money, no home, and was living "in a strange place."
>
> 12. On January 14, 2008, Mr. Zedner advised his probation officer and his counsel by e-mail (annexed hereto as Exhibit "A") that he had been arrested for assault in Israel on January 12, 2008. He stated that he had been released to his sister's custody on bond but, as the case was still under investigation, he was not permitted to leave Israel. The Report recounts that Ms. Ballard of the U.S. State Department contacted the Israeli police, who supposedly told her that the defendant was questioned regarding an alleged assault that took place on January 12, 2008. Report, at 10. The Report states: "Although they would not provide details of the allegations, they did state that the case remains under investigation but that the defendant had been questioned and released the same day. Report, at 10. Significantly, the Report does not dispute Mr. Zedner's contention that he was arrested before being released and that he is not legally permitted to leave Israel while the assault investigation continues. The Probation Department has in fact advised defense counsel that it does not know whether he is free to leave Israel at the present time. See Declaration of Tracey L. Eadie Gaffey, Esq., executed April 2, 2008, ¶ 3 (annexed hereto as Exhibit "B").

(Zas Decl. ¶¶ 10-12 (emphases added).)

The Zas Declaration argues that the government has failed to prove that Zedner is a fugitive because it has not shown that his failure to return to the United States is willful:

> Mr. Zedner . . . has apparently made genuine, albeit unsuccessful, efforts to obtain travel documents that would enable him to return to the United States. Mr. Zedner has also advised his probation officer and his counsel--without dispute from the Government--that his current bail conditions in Israel prevent him from leaving that jurisdiction. The Probation Department in fact concedes that it does not know whether Mr. Zedner is free to return to the United States. Accordingly, the Government, as the moving party, has not sustained its burden of showing that he is currently a "fugitive." . . . .
>
> 14. Further, because the Government's motion is based entirely on unsworn hearsay allegations--many of which Mr. Zedner disputes--an evidentiary hearing in the district court would be necessary before the motion could be granted. Such a hearing would allow Judge Spatt to hear the witnesses, including, if possible, the State Department official and Mr. Zedner via teleconference, and to resolve the disputed factual issues presented by the Government's motion. <u>These disputed issues include whether Mr. Zedner is free to leave Israel and return to the United States and whether his failure to return has been willful or simply the product of his well-documented mental illness or his indigency</u>.

(Zas Decl. ¶¶ 13-14 (emphasis added).)

The Zas Declaration argues that Zedner "wants to return to the United States once Israel permits him to leave" and that "there is every reason to believe" that he would do so, "particularly if the United States Government would be willing to pay for his return to this country." (Zas Decl. ¶ 16.) It argues that there is no basis for imposing any sanction on Zedner, either as a "penalty" or in the interest of "deterring flight[,] . . .

because the Government has not shown that Zedner's failure to return to the United States is willful." (Id. ¶ 17.)

Having scheduled oral argument on Zedner's appeal for April 24, 2008, this Court heard argument on the motion in tandem with oral argument of the appeal. Upon due consideration, we now grant the government's motion to dismiss.

## II. DISCUSSION

**A.  The Fugitive Disentitlement Doctrine**

> It has been settled for well over a century that an appellate court may dismiss the appeal of a defendant who is a fugitive from justice during the pendency of his appeal.

Ortega-Rodriguez v. United States, 507 U.S. 234, 239 (1993); see, e.g., Estelle v. Dorrough, 420 U.S. 534 (1975); Molinaro v. New Jersey, 396 U.S. 365 (1970); Allen v. Georgia, 166 U.S. 138 (1897); Bonahan v. Nebraska, 125 U.S. 692 (1887); Smith v. United States, 94 U.S. 97 (1876). In Ortega-Rodriguez, the Court noted that its "consistent[] and unequivocal[] approv[al of] dismissal as an appropriate sanction when a prisoner is a fugitive during the ongoing appellate process," 507 U.S. at 242 (internal quotation marks omitted), rests on any of "a number of justifications," id.

For example, in dismissing the previously granted writ of error in Smith, the Court based its decision on the lack of any assurance that its appellate decision would be enforceable and on

its unwillingness to waste judicial resources on a decision that the defendant could then render moot:

> It is clearly within our discretion to refuse to hear a criminal case in error, unless the convicted party, suing out the writ, is where he can be made to respond to any judgment we may render. In this case it is admitted that the plaintiff in error has escaped, and is not within the control of the court below, either actually, by being in custody, or constructively, by being out on bail. <u>If we affirm the judgment, he is not likely to appear to submit to his sentence. If we reverse it and order a new trial he will appear or not, as he may consider most for his interest. Under such circumstances, we are not inclined to hear and decide what may prove to be only a moot case</u>.

94 U.S. at 97 (emphasis added).

In <u>Allen</u>, the Court found a state appellate court's dismissal of an escaped defendant's appeal justified as punishment. Rejecting a due process challenge to the state court's dismissal of the appeal and refusal to reinstate the appeal following the defendant's subsequent recapture, the Supreme Court noted that holding the defendant to have abandoned his appeal "seems but a light punishment" for his escape during the appeal. 166 U.S. at 141.

In <u>Molinaro</u>, in which the convicted defendant became a fugitive during his appeal to the United States Supreme Court, the Court discussed the dismissals in <u>Smith</u>, <u>Allen</u>, and similar cases and stated:

> No persuasive reason exists why this Court should proceed to adjudicate the merits of a criminal case after the convicted defendant who has sought review escapes from the restraints placed upon him pursuant to the conviction. While such an escape does not strip the case of its character as an adjudicable case or controversy, we believe <u>it disentitles the</u>

- 14 -

defendant to call upon the resources of the Court for determination of his claims.

*Molinaro*, 396 U.S. at 366 (emphasis added). "[T]he premise of *Molinaro*'s disentitlement theory is that the fugitive from justice has demonstrated such disrespect for the legal processes that he has no right to call upon the court to adjudicate his claim." *Ortega-Rodriquez*, 507 U.S. at 246. The *Ortega-Rodriquez* Court held that dismissal of the appeal is not always justifiable when a defendant has absconded and been "returned to custody before *invocation* of the appellate system," *id.* at 249 (emphasis added), but stated that it "ha[d] no reason . . . to question the proposition that an appellate court may employ dismissal as a sanction when a defendant's flight operates as an affront to the dignity of the court's proceedings," *id.* at 246.

In *Estelle v. Dorrough*, 420 U.S. 534, the Supreme Court found dismissal of an appeal justified by the goals of punishment and deterrence, even with respect to a fugitive who, having escaped during the appeal, was recaptured before its actual dismissal. In that case, as described in *Ortega-Rodriquez*, the Court

> followed *Allen* . . . , upholding the constitutionality of a Texas statute providing for automatic appellate dismissal when a defendant escapes during the pendency of his appeal, unless the defendant voluntarily returns within 10 days. Although the defendant in *Estelle* had been recaptured before his appeal was considered and dismissed, resolving any enforceability problems, there were, we held, other reasons for dismissal. Referring to our own dismissal in *Molinaro*, we found that the state statute served "similar ends. . . . It *discourages the felony of escape and encourages voluntary*

- 15 -

surrenders. It promotes the efficient, dignified operation of the Texas Court of Criminal Appeals."

Ortega-Rodriquez, 507 U.S. at 241 (quoting Estelle v. Dorrough, 420 U.S. at 537) (emphasis ours).

Moreover, in Ortega-Rodriquez, the Court noted that, in a case that is "pending before the district court, flight can be deterred with the threat of a wide range of penalties available to the district court judge"; but when the defendant absconds after jurisdiction has vested in the appellate court, the only effective deterrent to escape that is available to the court of appeals may be dismissal of the appeal. 507 U.S. at 247. Thus, "dismissal by an appellate court after a defendant has fled its jurisdiction serves an important deterrent function . . . ." Id. at 242.

In addition, the Ortega-Rodriquez Court recognized that a prolonged escape from custody--even if the escape preceded the filing of the appeal--might make dismissal of the appeal an appropriate sanction on the ground that the government would be prejudiced in locating witnesses and presenting evidence at a retrial after a successful appeal. See id. at 249.

Distilling these principles, this Court has summarized the various justifications for deciding "to dismiss a criminal appeal pursuant to the fugitive disentitlement doctrine" as

> 1) assuring the enforceability of any decision that may be rendered against the fugitive; 2) imposing a penalty for flouting the judicial process; 3) discouraging flights from justice and promoting the efficient operation of the courts; and 4) avoiding prejudice to the other side caused by the defendant's escape.

United States v. Awadalla, 357 F.3d 243, 245 (2d Cir. 2004) ("Awadalla") (internal quotation marks omitted); see, e.g., United States v. Persico, 853 F.2d 134, 137 (2d Cir. 1988) (holding that a defendant who absconded during the district court proceedings and was recaptured before sentencing waived the right to review of challenges to pre-escape rulings); United States v. Morgan, 254 F.3d 424, 426-28 (2d Cir. 2001) (both (a) affirming the district court's application of the fugitive disentitlement doctrine in refusing to entertain a motion, made after the defendant's escape and return to custody, to withdraw a guilty plea entered prior to escape, and (b) applying that doctrine on appeal in refusing to consider the defendant's appellate challenges relating to the plea), cert. denied, 536 U.S. 913 (2002); see also Gao v. Gonzales, 481 F.3d 173, 175, 177 (2d Cir. 2007) ("Gao") (applying fugitive disentitlement doctrine in dismissing petition of an alien for review of an order of the Board of Immigration Appeals ("BIA"), and stating that "Gao's fugitive status means that there is no assurance that any decision or order we render against him will be enforced. The gravamen of his petition is the posture of 'heads I win, tails you'll never find me.'"), cert. denied, 128 S. Ct. 959 (2008); Bar-Levy v. U.S. Dep't of Justice, 990 F.2d 33, 34 (2d Cir. 1993) (alien's "fail[ure] to surrender for deportation . . . . makes him a 'fugitive from justice' and therefore brings him within the ambit of cases in which courts exercise their discretion to dismiss appeals by fugitives"); Empire Blue Cross & Blue Shield v. Finkelstein, 111 F.3d 278, 282 (2d Cir. 1997)

(applying the doctrine in dismissing the appeal of civil defendants who appealed from "an immense judgment" entered against them, then disappeared and could not be located or served with arrest warrants, rendering the "judgment against them unenforceable" (internal quotation marks omitted)); but see Degen v. United States, 517 U.S. 820, 825-28 (1996) (the justifications that warrant dismissal of a fugitive defendant's appeal from his conviction are less applicable to a suit for forfeiture of a defendant's property and do not permit the district court to strike his filings or grant summary judgment against him in that suit for failing to appear in a related criminal prosecution), superseded by statute, Civil Asset Forfeiture Reform Act of 2000, Pub. L. No. 106-185, 114 Stat. 202.

In the context of an appeal by a fugitive who is challenging his criminal conviction, each of the factors relied on by the Supreme Court in Smith, Molinaro, Allen, and Estelle v. Dorrough, discussed in Ortega-Rodriquez, and summarized in Awadalla is an independently sufficient basis on which to apply the fugitive disentitlement doctrine and dismiss the appeal. See Awadalla, 357 F.3d at 247; see also Gao, 481 F.3d at 176 (same with respect to a fugitive alien challenging a BIA decision).

## B. Zedner's Continued Absence from the United States

In the present case, in opposition to the government's motion to dismiss, Zedner contends that none of the above justifications apply to him, in part because, he argues, the

- 18 -

government has not shown that his absence is willful and hence has not proven him to be a "fugitive." Alternatively, Zedner contends that an evidentiary hearing is required before he can be so classified. We disagree.

Although Zedner disputes the government's statement that the Violation of Supervised Release report was filed in the district court, saying that the district court docket sheets do not show an entry for that Report (see Zas Decl. ¶ 7), the Zas Declaration concedes that the Report was served on Zedner's counsel in support of the present motion to dismiss (see id.); and Zedner has not contradicted any of the Report's allegations as to the pertinent events. Despite the Zas Declaration's statement that Zedner disputes "many" of the assertions made in the government's motion to dismiss (id. ¶ 14), the only issues it identifies are "whether Mr. Zedner is free to leave Israel and return to the United States and whether his failure to return has been willful or simply the product of his well-documented mental illness or his indigency" (id.). But Zedner has adduced no evidence that would warrant a hearing as to whether his failure to return was the result of mental illness; he claims that he was in fact unable to return to the United States because "he did not have any money to purchase [a return] ticket" (Zas Decl. ¶ 10) and because he cannot obtain permission from the Israeli government to leave Israel. Those assertions, which we will assume for purposes of this motion are true, do not advance his contention that his absence is not willful and that he is not a fugitive.

- 19 -

A condition of Zedner's supervised release was that he not leave the Eastern District of New York without the permission of the district court. There is no dispute that in August 2007, during the pendency of this appeal, Zedner was given permission to leave the United States for no more than two weeks; no dispute that before he left he "was specifically warned that if he did not return within two weeks of leaving the United States, he would be considered . . . to have absconded from supervision" (Report at 4); no dispute that he left the United States on September 9, 2007; and no dispute that as of the date of this opinion--some thirteen so far months after his departure--he has not returned.

As to the willfulness of his absence, the fact is that Zedner was expressly required to return to the United States within two weeks of his departure but purchased only a one-way ticket to Israel. If, as he claims, he lacked the money to purchase a round-trip or return ticket, his remaining in Israel beyond the court-ordered deadline, having traveled there without the means to return as required, constitutes a willful absence from the United States.

Further, Zedner asserts that he is now not allowed to leave Israel because he was arrested in January 2008 on a charge of criminal assault that is still pending. But Zedner became a fugitive when he failed to return to the United States as required on September 23, 2007. He did not shed his fugitive status by being accused of new criminal conduct that led to foreign

governmental restrictions more than three months after the deadline for his return.

We reject as well Zedner's contentions that the normal justifications for applying the fugitive disentitlement doctrine do not apply to him. As discussed above, any of them--assuring enforceability of any decision we may reach, imposing a penalty for flouting the judicial process, discouraging flights from justice, promoting the efficient operation of the courts, and avoiding prejudice to the government--independently may warrant dismissal of the appeal. Leaving aside the possibility of prejudice to the government in the form of needing to locate witnesses and resurrect their recollections in the event of a new trial, a prejudice that would be partly attributable to the original violations of the Speedy Trial Act, we think it plain that each of the other justifications warrants dismissal of Zedner's appeal.

"[A] fugitive who absconds in the course of an ongoing criminal appeal flouts the authority of the court from which he seeks relief. By imposing the sanction of disentitlement, that court can both protect the dignity of its proceedings and deter similarly situated parties from absconding." Awadalla, 357 F.3d at 246. The appropriateness of imposing a sanction against Zedner for disrespecting the dignity of this Court and for the purpose of deterring similar flights by others is obvious. Indeed, Zedner's only argument that these justifications are not applicable to him

is his contention that he is not a fugitive (see Zas Decl. ¶ 17), a contention we have rejected above.

Further, dismissal of this appeal is warranted because Zedner's absence from the United States both casts serious doubt on whether the decision of this Court on his appeal will be enforceable and impairs efficient operation of the court. In his 99-page brief on appeal, Zedner makes four arguments: that the district court's Speedy Trial Act dismissal of his 1996 indictment should have been with prejudice; that because the mandate for our decision in Zedner V did not issue until February 1, 2007, jurisdiction of his case resided in this Court rather than in the district court at the time of his 2006 trial, and hence his conviction at that trial was a nullity; that the government should have been estopped from arguing at his 2006 trial that he was not delusional; and that the trial court erred in excluding from evidence a prior government letter on that subject. If his arguments were rejected, we would have no assurance that Zedner would return to the United States to resume compliance with the terms of his supervised release. Moreover, of his four arguments, the only one whose acceptance could spare Zedner further criminal proceedings is the contention that the Speedy Trial Act dismissal should have been with, rather than without, prejudice--a difficult contention on which to prevail since the choice between those two sanctions is a matter that is committed to the sound discretion of the district court, see generally United States v. Taylor, 487 U.S. 326, 335 (1988); United States v. Wilson, 11 F.3d 346, 352

(2d Cir. 1993), cert. denied, 511 U.S. 1025 (1994). If Zedner were to prevail on either of his challenges to the district court's trial rulings or on his contention that his trial was a nullity because it was conducted while jurisdiction of his case was in this Court rather than the district court as a result of the tardy issuance of the Zedner V mandate, the remedy would be a new trial. And if we "order a new trial, [Zedner] will appear or not, as he may consider most for his interest," and we will have expended judicial resources on "what may prove to be only a moot case," Smith, 94 U.S. at 97.

Finally, we note that we have discretion to dismiss the appeal either with prejudice or without prejudice to reinstatement if the defendant returns to custody within a certain time. See, e.g., Awadalla, 357 F.3d at 247-50 (discussing cases and the lack of any bright-line rule as to when an appeal should be dismissed without prejudice). In Awadalla, we concluded that the appeal should be dismissed with prejudice, noting that

> Molinaro--the most recent decision of the Supreme Court that is directly on point--suggests that a defendant who jumps bail is no longer entitled to draw on the resources of an appellate court, and, therefore, should not be accorded additional time to return to custody before his appeal is dismissed.

Awadalla, 357 F.3d at 249. We observed that "where the court hearing an appeal is the same court from which the fugitive seeks relief from his conviction," the goals of punishment and deterrence generally warrant a dismissal with prejudice, because "any other course of action would dilute the sanction imposed for flouting the judicial process and reduce the deterrent effect of

- 23 -

that sanction." <u>Id</u>. at 249, 250. We agree and conclude that the present appeal should be dismissed with prejudice.

C. <u>A Few Words About the Dissent</u>

The dissent begins with the assertion that the question of whether the district court had jurisdiction to conduct Zedner's 2006 trial is "a decisive issue in this <u>case</u>." Dissenting Opinion at 1 (emphasis added). This issue, however, is plainly not dispositive of the case. This is not an issue of subject matter jurisdiction; it is purely a question as to the timing of the respective jurisdictions of this Court and the district court with respect to a prosecution that is plainly within federal subject matter jurisdiction. If we were to accept the contention that Zedner's 2006 trial and the consequent judgment of conviction were void because of their prematurity, the proper remedy would be to remand to the district court for a new trial, not to dismiss the case.

The dissent posits that because we have a special obligation to satisfy ourselves that we have jurisdiction over an appeal and that the district court had jurisdiction over the matter in question, "<u>we are not permitted</u> to reach the merits of . . . the government's motion to dismiss under the fugitive disentitlement doctrine." Dissenting Opinion at 5 (emphasis added). No authority is cited that supports that proposition. The dissent's only cite is to <u>Steel Co. v. Citizens for a Better</u>

Environment, 523 U.S. 83, 95 (1998), a case in which no party was a fugitive.

Nor has this Court intimated that the presence of a jurisdictional issue forecloses consideration of the fugitive disentitlement doctrine. In SEC v. Berger, 322 F.3d 187 (2d Cir. 2003), in which we decided a jurisdictional issue instead of dismissing on the fugitive disentitlement ground, we did so in the exercise of our discretion. In that case, the issue was subject matter jurisdiction (unlike the present case in which the question is the timing of jurisdiction) and was the only issue raised. And in opposition to the government's invocation of the fugitive disentitlement doctrine, the fugitive appellant made factual assertions--with regard to the enforceability of the judgment against him--as to which the record was undeveloped and would have required either a "remand for factual findings or" the submission of "affidavits directly to this Court." Id. at 192. Thus, "in the interests of judicial economy, we exercise[d] our discretion to reach the jurisdictional question . . . ." Id. (emphasis added).

We also note the dissent's statement that "Zedner's presence in Israel is completely irrelevant to our ability to decide the merits of his appeal." Dissenting Opinion at 7. Rarely, if ever, is the presence of an appellant essential to our "ability" to decide the merits of an appeal. The question here is whether Zedner is entitled to have his appeal decided when his absence from the United States plainly triggers the concerns

underlying the fugitive disentitlement doctrine, given, _inter alia_, that his continued absence from the United States would render the ultimate judgment resulting from a decision on the merits of his jurisdictional challenge unenforceable as a practical matter--regardless of whether he wins or loses.

The dissent concludes with the statement that our dissenting colleague can think of no worse ending to this matter than the dismissal of the appeal on the ground that Zedner's fugitive status disentitles him to pursue his appeal. We think it would be far worse to entertain the appeal despite his fugitive status, accept his contention that the 2006 conviction is a nullity, remand for a new trial, and have Zedner thumb his nose at the decision.

## CONCLUSION

We have considered all of Zedner's arguments in opposition to the government's motion to dismiss the appeal on the ground of Zedner's fugitive status and have found them to be without merit. The motion is granted. The appeal is dismissed with prejudice.